IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

IMADELDEEN HAMED,                    )
                                     )
                Plaintiff,           )
                                     )
v.                                   )          Civil Action No. 1:19cv0238 (TSE/JFA)
                                     )
ANDREW SAUL,                         )
Commissioner of Social Security,     )
                                     )
                Defendant.           )
_____)

## REPORT AND RECOMMENDATION

This matter is before the undersigned magistrate judge for a report and recommendation

pursuant to 28 U.S.C. § 636(b)(1)(B) on cross-motions for summary judgment. (Docket nos. 22,

24). Pursuant to 42 U.S.C. § 405(g), plaintiff seeks judicial review of the final decision of

Andrew Saul, Commissioner of the Social Security Administration ("Commissioner"),[1] finding

plaintiff no longer disabled as of December 18, 2014, and therefore no longer entitled to

Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the

Social Security Act. The Commissioner's final decision is based on a finding by the

Administrative Law Judge ("ALJ") and Appeals Council for the Office of Disability

Adjudication and Review ("Appeals Council").[2]

---

[1] Andrew Saul, the Commissioner of the Social Security Administration, replaced Nancy A. Berryhill, the former Acting Commissioner of the Social Security Administration.

[2] The Administrative Record ("AR") in this case has been filed under seal, pursuant to Local Civil Rules 5 and 7(C). (Docket no. 18). In accordance with those rules, this report and recommendation excludes any personal identifiers such as plaintiff's social security number and date of birth (except for the year of birth), and the discussion of plaintiff's medical information is limited to the extent necessary to analyze the case.

1

On July 26, 2019, plaintiff filed a motion for summary judgment (Docket no. 22) and a memorandum in support (Docket no. 23).  Thereafter, the Commissioner submitted a cross-motion for summary judgment (Docket no. 24), a memorandum in support (Docket no. 25), and a memorandum in opposition (Docket no. 26).  Plaintiff filed his response to the Commissioner's cross-motion on September 17, 2019.  (Docket no. 28).  Both parties waived oral argument.  (Docket nos. 27, 29).

For the reasons set forth below, the undersigned recommends that plaintiff's motion for summary judgment (Docket no. 22) be denied, the Commissioner's motion for summary judgment (Docket no. 24) be granted, and the Commissioner's final decision be affirmed.

## I. PROCEDURAL BACKGROUND

On January 15, 2009, plaintiff applied for DIB and SSI with an alleged onset date of December 26, 2007.  (AR 123).  While visiting Saudi Arabia, plaintiff had been hospitalized and diagnosed with a nasopharyngeal carcinoma with bone metastasis.  (AR 210).  On March 28, 2009,[3] in a decision that is not the subject of this appeal, the Social Security Administration ("SSA") found plaintiff disabled and awarded benefits effective December 26, 2007.  (AR 125).  The SSA determined plaintiff was unable to work due to his diagnosis, which met Listing 13.02D of Code of Federal Regulations, Title 20, Part 404, Subpart P, Appendix 1.  20 C.F.R. §§ 404.1520(d), 416.920(d).  (AR 23, 50).

On December 18, 2014, the SSA determined plaintiff was no longer disabled and his benefit payments would stop after two months.  (AR 53).  The SSA found plaintiff's condition had medically improved and he was no longer prevented from engaging in employment.  (AR 54).  Plaintiff requested reconsideration of this decision on February 11, 2015.  (AR 56).  On

---

[3] As the most recent favorable medical decision to find plaintiff disabled, this decision is referred to as the "comparison point decision."

2

September 21, 2016, a Disability Hearing Officer ("DHO") upheld the determination.  (AR 67–73).  The DHO found plaintiff's cancer in remission, thus medical improvement had occurred since the comparison point decision.  (AR 70).  This medical improvement, the DHO indicated, was related to plaintiff's ability to work.  (AR 70–71).  Plaintiff was found to have a residual functional capacity for light work.  (AR 69, 73).

After receiving notice of this decision, plaintiff requested a hearing before an ALJ.  (AR 74).  The Office of Disability Adjudication and Review acknowledged receipt of plaintiff's request (AR 75–77) and later scheduled a hearing for September 20, 2017.  (AR 96).  Between plaintiff's request and the hearing date, plaintiff signed an "Appointment of Representative" form authorizing Lewis E. Gelobter to represent him with respect to his "claim(s) or asserted right(s) under: Title II (RSDI) [and] Title XVI (SSI)."  (AR 49).

At the beginning of the September hearing, ALJ Bonnie Hannan determined it was necessary to have an interpreter present in-person and the hearing was deferred to a later date.  (AR 21, 568–69).  The Office of Disability Adjudication and Review scheduled a new hearing for November 1, 2017.  (AR 30).  The ALJ held the second proceeding in Washington, D.C. on the scheduled date.  (AR 533).  Plaintiff appeared by video-teleconference with Mr. Gelobter.  (Id.).  Plaintiff provided testimony and answered questions posed by the ALJ and plaintiff's representative.  (AR 539–54).  A vocational expert also answered questions from the ALJ and plaintiff's representative.  (AR 554–61).  On March 21, 2018, the ALJ issued her decision finding that plaintiff's disability had ended on December 18, 2014, and that he had not become disabled again since that date.  (AR 21–29).  Subsequently, plaintiff filed a request for review with the Appeals Council on May 18, 2018, asserting that he still could not work.  (AR 529).  The Appeals Council denied the request on December 22, 2018, finding no reason under its rules

to review the ALJ's decision.[4]  (AR 8).  As a result, the ALJ's decision became the final decision

of the Commissioner.  (*Id.*).  *See* 20 C.F.R. §§ 404.981, 416.1481.  Plaintiff was given sixty (60)

days to file a civil action challenging the decision.  (AR 9).

On February 27, 2019, plaintiff timely filed this civil action seeking judicial review of the

Commissioner's final decision pursuant to 42 U.S.C. § 405(g).  (Docket no. 1).  The following

day, the court entered an order setting the summary judgment briefing schedule.  (Docket no. 6).

On June 26, 2019, the parties filed a joint motion to enlarge the briefing schedule.  (Docket no.

20).  The court granted the motion on July 2, 2019.  (Docket no. 21).  This case is now before the

undersigned for a report and recommendation on the parties' cross-motions for summary

judgment.  (Docket nos. 22, 24).

## II. STANDARD OF REVIEW

Under the Social Security Act, the court will affirm the Commissioner's final decision

"when an ALJ has applied correct legal standards and the ALJ's factual findings are supported

by substantial evidence."  *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v.

Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)).  Substantial evidence is "such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389,

---

[4] Plaintiff raises for the first time in his reply brief that the record for review is
incomplete because the letter his attorney sent to the Appeals Council dated December 7, 2018,
making certain arguments as to why the ALJ's decision is not supported by substantial evidence
was not included in the Administrative Record.  (Docket no. 28 at 1).  On October 12, 2018, the
Appeals Council notified plaintiff's counsel that it was granting his request for more time before
any action would be taken and stated that any additional information must be sent within 25 days
from the date of the letter and that if no information is received within 25 days, "we will assume
that you do not want to send us more information" and "we will then proceed with our action
based on the record we have."  (AR 12–13).  Plaintiff's December 7, 2018 letter was not
submitted in a timely manner and a review of that letter reveals it does not submit any new
evidence but merely contains many of the same legal arguments presented in this appeal.
Accordingly, this argument is without merit.

401 (1971)).  It is "more than a mere scintilla of evidence but may be somewhat less than a

preponderance." *Id.* (internal quotations and citations omitted).  In determining whether a

decision is supported by substantial evidence, the court does not "undertake to re-weigh

conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the

Secretary." *Id.* (alteration in original) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)).

It is the ALJ's duty to resolve evidentiary conflicts, not the reviewing court, and the ALJ's

decision must be sustained if supported by substantial evidence. *Smith v. Chater*, 99 F.3d 635,

638 (4th Cir. 1996).

### III.  FACTUAL BACKGROUND

#### A.    Plaintiff's Age, Education, and Employment History

Plaintiff was born in 1964 and was fifty-three years old at the time of the ALJ hearing on

November 1, 2017.  (AR 28).  Plaintiff testified that he was educated in Sudan and attended

college there.  (AR 541).  For a short period, plaintiff attended English as a second language

classes in a local church in Sterling, Virginia, although he stopped attending those classes when

the church moved.  (*Id.*).  Plaintiff worked as a computer and electronics repair mechanic in

Sudan from 1989 to 1993 and Saudi Arabia from 1993 to 2001.  (AR 155).  Upon moving to the

United States, plaintiff continued in this type of employment, working for computer and

cellphone companies as a technical engineer.  (AR 129–32, 139–41, 146–48, 155, 542).  Plaintiff

stopped working in December 2007 because of his ill health.  (AR 154).  The ALJ found plaintiff

had not engaged in substantially gainful activity since that date and through the date of the

hearing decision.  (AR 23).

**B.    Summary of Plaintiff's Medical History Before Alleged End Date of Disability[5]**

While visiting Saudi Arabia in December 2007, plaintiff was admitted to the hospital with a decreased level of consciousness and headache. (AR 210). Doctors initially diagnosed his condition as bacterial meningitis, administering plaintiff a course of antibiotics. (AR 210, 222). During treatment, a CT scan of plaintiff's brain and neck conducted on December 31, 2007 revealed what appeared to be a Stage 4 "poorly differentiated" nasopharyngeal carcinoma. (AR 210). On January 20, 2008, a bone scan also appeared to show plaintiff had bone metastasis at L1, L4, and L5. (Id.). As a result of this diagnosis, plaintiff received five cycles of palliative chemotherapy. (Id.). Although the chemotherapy did not result in a change to the size of the mass (AR 210, 239), it did appear to stabilize the mass. (AR 210, 312). The chemotherapy was stopped when plaintiff developed deep venous thrombosis in his right calf. (AR 312, 480). He also went on to develop pulmonary embolus. (AR 210, 480).

In August 2008 and shortly after his return to the United States, plaintiff visited Seven Corners Medical Center seeking treatment options for what he believed was nasopharyngeal carcinoma and he was referred to an oncologist. (AR 224). On the direction of Dr. Masoom Kandahari, a specialist in Hematology and Oncology at Inova Fairfax Hospital, plaintiff underwent a PET CT scan which was performed by Fairfax Radiological Consultants, PC on August 27, 2008. (AR 226–31). The scan showed a metabolically active nasopharyngeal mass extending with destructive bone changes into the base of the skull/suprasellar area consistent with the primary tumor but no definite evidence of local metastatic disease to the cervical lymph

---

[5] The AR contains over 300 pages of medical records from various sources relating to plaintiff's medical treatments. This summary provides an overview of plaintiff's medical treatments and conditions relevant to his claims and is not intended to be an exhaustive list of every medical treatment.

nodes or distant metastasis. (AR 228). Given the earlier diagnosis of nasopharyngeal carcinoma, Dr. Kandahari informed plaintiff that while it seems he does not have distant metastasis, he would benefit from radiation therapy and possibly more chemotherapy. (AR 242). However, Dr. Kandahari indicated a need to await the recommendations from a radiation oncologist and an ENT specialist. (*Id.*).

Plaintiff first visited the University of Virginia's Neuro-Oncology Clinic on October 1, 2008 and was seen by Dr. Benjamin Purow. (AR 480). Plaintiff reported that he sometimes had numbness in his fingers and toes as well as "electrical-type" pains in his toes. (*Id.*). Dr. Purow observed that plaintiff was alert and oriented but with "endocrine issues and a very high prolactin level." (AR 481). In the report from the MRI of plaintiff's brain dated October 21, 2008, it is noted that the tumor could be a primary nasopharyngeal tumor, a primary pituitary tumor, or a primary tumor of the skull base. (AR 250). Given this MRI report and plaintiff's very high prolactin levels, a biopsy of the tumor located in plaintiff's nasal cavity was performed in December 2008. (AR 251–52). The biopsy revealed the tumor was of a pituitary origin (and not carcinoma) and given the high levels of prolactin, plaintiff was re-diagnosed with prolactinoma and started on cabergoline, resulting in shrinkage of the tumor alongside a decrease in his prolactin levels. (AR 252, 312, 483).

Plaintiff was seen for a follow-up appointment with Dr. Purow approximately six months later on March 18, 2009. (AR 483). Dr. Purow noted that plaintiff was responding "terrifically well" to the cabergoline treatment and his prolactin levels were almost down to normal range. (AR 483–84). Plaintiff reported that he was suffering from right knee rigidity and tenderness, some itchiness in the nose, and frequent nocturia. (AR 483).

7

On plaintiff's next visit to the Neuro-Oncology Clinic on January 22, 2010, he saw Dr. Schiff. (AR 486). While plaintiff's response to cabergoline remained good, he reported some changes in his vision and hearing, both of which Dr. Schiff recommended for follow up consultations with Dr. Newman and plaintiff's primary care physician, respectively. (AR 487–88). Plaintiff's visits to the Neuro-Oncology Clinic became less frequent and he was not seen again until June 29, 2011. (AR 490). On this visit, plaintiff again reported foot pain and numbness, which Dr. Purow noted as relating to the effects of plaintiff's prior chemotherapy. (AR 491). Plaintiff was seen a year later on June 6, 2012. (AR 493). His prolactinoma was noted as radiographically stable and he was to continue with the cabergoline treatment. (AR 494). Plaintiff stated that he continued to experience numbness in both feet and memory problems. (AR 493).

Dr. Purow reviewed a new MRI scan at plaintiff's next visit on June 5, 2013, and noted that it looked unchanged. (AR 496). Plaintiff continued to suffer from foot pain and numbness for which Dr. Purow recommended increasing the dosage of gabapentin as required. (*Id.*). On April 23, 2014, at plaintiff's next visit to the Neuro-Oncology Clinic, he reported that the gabapentin had not provided relief from the foot pain. (AR 315, 497). Since gabapentin had not been successful in treating plaintiff's foot pain and numbness, Dr. Purow prescribed pregabalin (Lyrica). (AR 315, 498). Plaintiff also reported shortness of breath and chest pain, which was a result of his sleeping issues. (*Id.*). Dr. Purow suspected this to be sleep apnea and arranged for a sleep study. (*Id.*). Plaintiff also reported hearing loss and swelling of the throat. (*Id.*).

Following plaintiff's concerns about increasing hearing loss, Dr. Debra Hildebrand, also located at the University of Virginia hospital, administered an audiology assessment on May 21, 2014. (AR 313, 425). The audiogram showed a "mild sloping to profound primarily

8

sensorineural hearing loss in the right ear and a moderate sloping to profound mixed hearing loss in the left ear." (*Id.*). Plaintiff's word recognition was good with a 96% accuracy level for his right ear and a 92% accuracy for his left ear. (*Id.*). Dr. Hildebrand recommended that plaintiff follow up with treatment for the conductive portion of his hearing loss. (*Id.*).

Pursuant to Dr. Purow's referral, plaintiff underwent a sleep study on June 1 and 2, 2014. (AR 383–390). The results of this study indicated "mild obstructive sleep hypopnea" and a recommendation that a conservative approach including weight loss and avoiding sedatives and hypnotics would "not be unreasonable." (AR 390).

### C.    Summary of Plaintiff's Medical History After December 18, 2014, the Alleged End Date of Disability

On April 29, 2015, plaintiff visited Dr. Purow for his yearly follow-up appointment. (AR 499). Plaintiff underwent a physical, including a general and neurological examination. (AR 501). He was found to be alert and interactive and able to recall three out of three complex items. (*Id.*). Dr. Purow again noted the successful treatment of plaintiff's prolactinoma with cabergoline and that plaintiff's paresthesia looked to have been resolved with Lyrica. (AR 503). As a result, plaintiff was free to follow-up with the Neuro-Oncology Clinic on an "as-needed basis." (*Id.*). On the same day, plaintiff also saw Dr. Marshall at the Pituitary Clinic. (AR 426). Dr. Marshall observed that plaintiff had made a "remarkable recovery" from his prolactinoma.

On his March 2, 2016 visit to the Neuro-Oncology Clinic, plaintiff reported increased dizziness when using the stairs and prolonged standing. (AR 504). He stated that he had fallen ten days prior to his appointment resulting in a skinned knee. (*Id.*). He was no longer on pregabalin (Lyrica) because Medicaid had stopped covering it and he stated that his leg pain had worsened since discontinuing Lyrica. (*Id.*). Plaintiff felt his balance had decreased and that he could not sit down for long periods due to pain flare-ups. (*Id.*). Dr. Purow proceeded to examine

plaintiff and observed that his gait was regular and his toe-walking and tandem walking were within normal limits, although he was slightly unsteady with tandem walking and he was unsteady with heel-walking. (AR 505). Plaintiff had normal strength and sensation in all four extremities. (*Id.*). During this exam plaintiff had difficulty with the finger-to-nose test and was past-pointing with both hands. (*Id.*). Dr. Purow suggested that plaintiff's dizziness, decreased balance, and decrease in short-term memory could be effects from the past chemotherapy. (*Id.*).

Eight months later, on November 1, 2016, plaintiff returned to the Neuro-Oncology Clinic. (AR 506). Again, plaintiff reported that he was no longer taking Lyrica because it was not covered under his insurance. (*Id.*). He continued to have numbness in his legs with some pain, including his knees. (*Id.*). Plaintiff also reported that his vision had worsened so he was wearing reading glasses daily and that his hearing on the left had decreased. (*Id.*). His MRI scan showed no signs of tumor regrowth. (AR 509). Plaintiff was alert and interactive during the examination and could recall two out of three complex items. (AR 507). At this visit it was noted that plaintiff's gait was normal, he had full muscle strength in his extremities, and no Romberg sign. (*Id.*). Plaintiff performed the finger-to-nose test without dysmetria and overshoot. (*Id.*). Dr. Purow advised plaintiff to return to the Neuro-Oncology Clinic again eighteen months later and suggested that plaintiff resume taking Lyrica. (AR 508).

On September 7, 2017, Dr. Purow signed several medical source statement forms including a "Peripheral Neuropathy Medical Source Statement," a "Physical Medical Source Statement," and a "Dizziness Medical Source Statement." (AR 509–21). Dr. Purow indicated plaintiff's paresthesias was severe and could be expected to last at least twelve months. (AR 509). Symptoms included numbness, tingling, and pain in plaintiff's feet as well as "electrical shooting" in his hands and forearms. (AR 509, 513). Dr. Purow also stated that plaintiff had a

10

new complaint concerning the vision in his left eye. (AR 512). In annotations on the source statements, Dr. Purow noted plaintiff's reported dizziness resulting from stairs and prolonged standing, as well as plaintiff's statements that it was difficult to sit still for long periods of time due to flares in pain. (AR 510, 520–21). Dr. Purow also indicated that plaintiff's neuropathy was caused by "inappropriate chemotherapy" in Saudi Arabia. (AR 509, 513).

According to a note signed by Dr. Nathan Wilbank, plaintiff visited the University of Virginia's Ophthalmology Clinic on July 3, July 31, and August 24, 2017 concerning his vision issues. (AR 473). In this note Dr. Wilbank states that plaintiff had a "condition" that "severely limited" his left eye vision. (*Id.*). Dr. Wilbank further noted that it was unlikely plaintiff would regain much vision in that eye, but that plaintiff sees 20/30 in his right eye. (*Id.*). Toward the end of September 2017, plaintiff presented at a follow-up ophthalmology appointment. (AR 522). Dr. Brian Conway, the treating physician for the appointment, observed that plaintiff had a sub macular hemorrhage in his left eye. (AR 526). This had begun as a "substantial sub macular scar" but had increased due to a hemorrhage. (*Id.*). On the date of the visit, Dr. Conway noted that plaintiff may have had further hemorrhaging from the edges of the scar and that he was considering switching treatment from Avastin to Eylea in the future. (*Id.*). At the appointment, plaintiff reported that his vision was a "little better than before" but he had "floaters and flashes." (AR 523). He denied vision loss. (*Id.*). Plaintiff received his fourth Avastin injection at the appointment, after which he was able to count fingers from at least two feet. (AR 525).

### D.    The ALJ's Decision on March 21, 2018

The ALJ concluded that plaintiff's disability had ended as of December 18, 2014, and he had not become disabled again since that date. (AR 29). When determining whether a claimant who was previously found disabled continues to be disabled under applicable regulations, the

11

ALJ is required to apply an eight-step sequential evaluation process for Title II claims and a seven-step sequential evaluation process for Title XVI claims.[6] *See* 20 C.F.R. §§ 404.1594, 416.994. It is these processes the court examines to determine whether the correct legal standards were applied and whether the ALJ's decision is supported by substantial evidence in the record. *See* 20 C.F.R. §§ 404.1520, 416.920.

Specifically, the ALJ considers the following sequential evaluation: (1) is the claimant currently performing substantial gainful activity; (2) does the claimant have an impairment or combination of impairments that meets or medically equals a listing; (3) has there been medical improvement since the initial disability determination; (4) if medical improvement has occurred, whether the improvement is related to claimant's ability to work; (5) if there is no medical improvement—or the improvement is not related to the claimant's ability to work—whether an exception to this step applies; (6) are the claimant's current impairments, in combination, "severe"; (7) if the claimant's impairments are "severe," what is the claimant's residual functional capacity and can the claimant perform past relevant work; (8) if the claimant cannot perform past relevant work, whether other work exists that the claimant can perform given his residual functional capacity, age, education, and past work experience. If a claimant can perform other work, he is no longer considered disabled; however, if a claimant cannot perform other work, his disability continues. 20 C.F.R. § 404.1594, § 416.994. (AR 21–23).

---

[6] The two processes have significant overlap. The one difference occurs at Step One: for a Title II claim, the ALJ is required to determine if the claimant is engaging in substantial gainful activity; for a Title XVI claim, the performance of substantial gainful activity is not a factor used to determine if the claimant remains disabled.

On March 21, 2018, the ALJ determined that plaintiff's disability under sections 216(i) and 233(f) of the Social Security Act ended on December 18, 2014. (AR 29). In reaching that decision, the ALJ made the following findings of fact:

(1) The most recent favorable medical decision finding that plaintiff was disabled is the determination dated March 13, 2009 (the "comparison point decision");

(2) At the time of the comparison point decision, plaintiff had the following medically determinable impairments: nasopharyngeal carcinoma with bone metastasis. These impairments were found to meet section 13.02 of 20 C.F.R. § 404, Subpart P, App. 1;

(3) Through March 21, 2018, plaintiff had not engaged in substantial gainful activity;

(4) The medical evidence establishes that, since December 18, 2014, plaintiff had the following medically determinable impairments: prolactinoma/pituitary tumor, chemotherapy-induced neuropathy, submacular hemorrhage in the left eye, sensorineural hearing loss, and obesity—all of which are plaintiff's current impairments;

(5) Since December 18, 2014, plaintiff did not have an impairment or combination of impairments which met or medically equaled the severity of an impairment listed in 20 C.F.R. § 404, Subpart P, App. 1;

(6) Medical improvement occurred as of December 18, 2014;

(7) The medical improvement is related to the ability to work because, as of December 18, 2014, plaintiff's impairments as set forth in the determination dated March 13, 2009, no longer met or medically equaled the same listing that was met at the time of the comparison point decision;

(8) As of December 18, 2014, plaintiff continued to have a severe impairment or combination of impairments;

(9) Based on the impairments present as of December 18, 2014, plaintiff has the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b), except he can occasionally operate foot controls bilaterally. While plaintiff can occasionally climb ramps and stairs, occasionally balance, stoop, kneel, crouch, and crawl, and can frequently handle, finger, and feel, he can never climb ladders, ropes, or scaffolds. Plaintiff can never work at unprotected heights, with moving mechanical parts, or other similar workplace hazards. He can have occasional exposure to humidity, wetness, dust, odors, fumes, pulmonary irritants, and vibration, but never have exposure to extreme cold or heat. Plaintiff can perform jobs that do not require communication in English or the use of a telephone. He cannot perform assembly line work;

(10) As of December 18, 2014, plaintiff is unable to perform past relevant work;

(11) On December 18, 2014, plaintiff was an individual closely approaching advanced age;

(12) Plaintiff has at least a high school education and is able to communicate in English;

(13) Beginning on December 18, 2014, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that plaintiff is "not disabled," whether or not plaintiff has transferable job skills;

(14) As of December 18, 2014, considering plaintiff's age, education, work experience, and residual functional capacity based on his current impairments, plaintiff has been able to perform a significant number of jobs in the national economy; and

(15) Plaintiff's disability ended on December 18, 2014, and plaintiff has not become disabled again since that date.  (AR 23–29).

## IV. ANALYSIS

### A.   Overview

Plaintiff's complaint, filed on February 27, 2019, challenges the Commissioner's final decision on three grounds and requests judicial review pursuant to 42 U.S.C. § 405(g).  (Docket no. 1).  Plaintiff later clarified his position in his motion for summary judgment and memorandum in support (Docket nos. 22, 23), arguing that the ALJ committed two main errors. First, plaintiff contends that the ALJ erred when she ruled that he had the residual functional capacity to perform light work and that his disability had ended as of December 18, 2014. (Docket no. 23 at 5–9).  Second, plaintiff contends that the ALJ erred when she assigned little weight to the opinion of plaintiff's treating physicians and that she failed to properly develop the record.  (*Id.* at 9–12).  For the reasons discussed below, the undersigned recommends a finding that the ALJ's residual function capacity determination is supported by substantial evidence, that the ALJ properly explained the weight accorded to plaintiff's treating physicians, and the decision that plaintiff was able to perform work as of December 18, 2014 be affirmed.

14

**B.** **Substantial Evidence Supports the ALJ's Assessment of Plaintiff's Residual Functional Capacity and Finding that Plaintiff's Disability had Ended**

Plaintiff argues that the ALJ erroneously concluded that he had the residual functional capacity to perform light work and that his disability had ended. (Docket no. 23 at 9). He alleges that the ALJ failed to consider the combined effects of his impairments in reaching this conclusion. (*Id.*). The Commissioner contends that plaintiff's request amounts to asking the court to "re-weigh the evidence and second-guess the ALJ." (Docket no. 25 at 11). The Commissioner argues that the ALJ applied the correct law in reaching her conclusion and detailed the substantial evidence to support her finding. (*Id.* at 16).

Residual functional capacity is "the most [plaintiff] can still do despite [his] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a). It is based "on all the relevant evidence in [the] case record" and includes plaintiff's own subjective statements. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a). If an individual has several impairments, the ALJ must consider their cumulative effect in making a disability determination. 20 C.F.R. §§ 404.1545(e), 416.945(e); *see also Hines v. Bowen*, 872 F.2d 56, 59 (4th Cir. 1989) ("This court has held that in determining whether an individual's impairments are of sufficient severity to prohibit basic work-related activities, an ALJ must consider the combined effect of a claimant's impairments."). Upon finding that a plaintiff cannot perform past relevant work, it is the Commissioner's burden to show that there is other work existing in significant numbers in the national economy that plaintiff could perform given his residual functional capacity, age, education, and work experience. 20 C.F.R. §§ 404.1560(c), 416.945(a)(5)(ii).

Here, the ALJ determined that plaintiff had the residual functional capacity to:

Perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except he can occasionally operate foot controls bilaterally. [Plaintiff] can occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds. He can

15

occasionally balance, stoop, kneel, crouch, and crawl, and can frequently handle, finger, and feel. [Plaintiff] can never work at unprotected heights, with moving mechanical parts, or other similar workplace hazards. He can have occasional exposure to humidity, wetness, dust, odors, fumes, pulmonary irritants, and vibration, but never have exposure to extreme cold and extreme heat. He can perform jobs that do not require communication in English or the use of a telephone. He cannot perform assembly line work. (AR 24).

1. *The ALJ Satisfied the Requirements of Social Security Ruling 96-8p in Determining Plaintiff's Residual Functional Capacity*

Social Security Ruling 96-8p ("Ruling 96-8p") provides the analytical framework by which an ALJ determines a claimant's residual functional capacity. The residual functional capacity assessment "must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions listed in the regulations." *Mascio*, 780 F.3d at 636 (citing SSR 96-8p). Ruling 96-8p further explains that the "assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (*e.g.*, laboratory findings) and nonmedical evidence (*e.g.*, daily activities, observations)." *Id.* (citing SSR 96-8p). Throughout the analysis, the ALJ is required to assess and explain her evaluation of the combined effects of a claimant's impairments. 20 C.F.R. §§ 404.1523, 416.923; *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). The Fourth Circuit has held that remand may be appropriate "where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio*, 780 F.3d at 636 (citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)).

Plaintiff asserts that the ALJ failed to consider the combined effects of his impairments citing to Social Security Rulings 85-28[7] and 19-2.[8]  (Docket no. 23 at 6, 8).   Plaintiff argues that although the ALJ found his obesity was severe, she failed to account for the effects of sleep apnea and diabetes when considering the effects of his obesity on his residual functional capacity.  (*Id.* at 8).  Plaintiff refers to his Epworth Sleepiness Score[9] of twenty out of twenty-four which placed him within the range of "severe excessive daytime sleepiness."  (Docket no. 23 at 9).

Here, the ALJ properly and adequately engaged in the analysis required by Ruling 96-8p. In her decision, the ALJ discussed various treatment records and progress notes concerning plaintiff's medical issues; evaluations by state agency consultants, plaintiff's treating physicians, and others; records pertaining to plaintiff's education and work experience; and the vocational expert's testimony.  (AR 23–28).  She also determined plaintiff's residual functional capacity. (AR 24).  The ALJ's identification of plaintiff's limitations alongside a narrative discussion detailing the evidence in support of her conclusions is precisely what Ruling 96-8p requires.

---

[7] Social Security Ruling 85-28 clarifies "the policy for determining when a person's impairment(s) may be found 'not severe' and, thus, the basis for a finding of 'not disabled' in the sequential evaluation of disability."  The Ruling notes, and plaintiff cites, that if an adjudicator cannot clearly determine the effect of an impairment, or combination of impairments, the sequential evaluation process should continue, not end with a finding of "not severe."

[8] Social Security Ruling 19-2p provides guidance on how the SSA establishes a claimant has a medically determinable impairment of obesity and how obesity is evaluated under Title II and Title XVI claims.  Plaintiff quotes the following sentence from the Ruling: "[t]he combined effects of obesity with another impairment(s) may be greater than the effects of each of the impairments considered separately."  (Docket no. 23 at 8–9).

[9] As plaintiff notes, the Epworth Sleepiness Scale (ESS) is used to assess situations in which an individual has fallen asleep.  (Docket no. 23 at 9).  It is a self-administered study.  *See About the ESS,* THE EPWORTH SLEEPINESS SCALE, http://epworthsleepinessscale.com/about-the-ess/ (last visited Sept. 17, 2019).

The ALJ first determined that as of December 18, 2014, plaintiff had the following severe impairments: prolactinoma/pituitary tumor, chemotherapy-induced neuropathy, a submacular hemorrhage in his left eye, sensorineural hearing loss, and obesity. (AR 23). She also found that plaintiff had been diagnosed with diabetes which was controlled with medication and did not limit his ability to work. (*Id.*). The ALJ found that the severity of these impairments, considered individually and in combination, did not meet or medically equal the criteria of the listings in 2.00 (special senses and speech), 11.00 (neurological disorders), and 13.00 (malignant neoplastic diseases), respectively. (AR 24).[10] The ALJ then specifically discussed plaintiff's obesity, concluding that although severe, the medical evidence pertaining to this condition did not meet the severity found in any listing. (*Id.*).

Continuing her assessment, the ALJ recognized that plaintiff's medically determinable impairments could reasonably be expected to produce his pain and symptoms, but that his statements regarding the intensity, persistence, and limiting effects of the symptoms was not consistent with the objective medical evidence. (AR 25). Accordingly, plaintiff's statements could only be found to affect his ability to work to the extent that they were consistent with the evidence. (*Id.*). The ALJ began with plaintiff's neurological issues. (*Id.*). She considered the objective medical evidence first, explaining plaintiff's initial diagnosis of metastatic nasopharyngeal carcinoma, his later re-diagnosis of prolactinoma, and the development of neuropathy resulting from chemotherapy. (AR 25–26). She then proceeded to discuss the objective medical evidence that proved inconsistent with plaintiff's claim that his neurological issues prevented him from engaging in light work. (*Id.*). This included a discussion of

---

[10] As noted above, plaintiff's initial disability determination was based on an incorrect diagnosis of nasopharyngeal carcinoma with bone metastasis that was found to meet Listing 13.02D. (AR 23, 50).

plaintiff's "remarkable response" to the treatment of his prolactinoma and affirmation that his condition was stable. (*Id.*). Plaintiff also indicated that Lyrica had helped to alleviate his symptoms relating to neuropathy from his previous chemotherapy (AR 26, 430) which Dr. Purow noted "as resolved" in his April 29, 2015 report (AR 503). The ALJ referred to the medical records indicating that, with the exception of unsteady heel walking, plaintiff had normal musculoskeletal and cranial nerve examinations, including intact sensation, 5/5 strength in all extremities, no Romberg sign, and ability to toe and tandem walk. (AR 26). The ALJ also considered plaintiff's subjective statements concerning his abilities, such as being able to "help with household chores" and other activities of daily life. (*Id.*). Based on this evidence, the ALJ concluded that plaintiff was capable of light level work with limitations pertaining to posture and manipulation. (*Id.*).

The ALJ continued in this same format to discuss plaintiff's hearing and vision problems and his obesity, noting the functional limitations substantiated in the medical records and including limitations on workplace hazards, dangerous machinery, and use of a telephone. (AR 26). As discussed above, the ALJ's analysis followed precisely the framework set forth in Ruling 96-8p.

Further, it is clear from the ALJ's decision that she factored each impairment and the combined impact of those impairments into her final assessment. For example, in her discussion concerning plaintiff's obesity, the ALJ expressly notes that she "considered the potential effects of [plaintiff's] obesity with the other impairments in formulating the residual functional capacity." (*Id.*). Accordingly, the ALJ demonstrated her consideration of the cumulative impact of plaintiff's impairments in determining his residual functional capacity.

Based on a review of the ALJ's decision and the evidence in the record (including the various medical opinions from plaintiff's treating physicians and the assessments from Dr. Staehr and Dr. Kadian discussed below), the undersigned recommends a finding that the ALJ's determination of plaintiff's residual functional capacity is supported by substantial evidence.

2.    *Substantial Evidence Supports the Finding that Plaintiff Could Perform Work in the National Economy Given His Residual Functional Capacity*

As noted above, following an ALJ's finding that a plaintiff cannot perform past relevant work, the burden falls upon the Commissioner to show that other work, existing in significant numbers in the national economy, is available and which a plaintiff could perform given his residual functional capacity, age, education, and work experience. 20 C.F.R. §§ 404.1560(c), 416.945(a)(5)(ii).  To assist the ALJ, a vocational expert may be called to testify.  *Walker*, 889 F.2d at 50.  For the vocational expert's opinion to be helpful, "it must be based upon a consideration of all other evidence in the record . . . and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments."  *Id.* (citing *Stephens v. Sec'y of Health, Educ.& Welfare*, 603 F.2d 36 (8th Cir. 1979) and *Chester v. Matthews*, 403 F. Supp. 110 (D. Md. 1975)).  If the hypothetical questions omit limitations, the vocational expert's testimony is of limited value and may not constitute substantial evidence.  *Johnson v. Barnhart*, 434 F.3d 650, 659 (4th Cir. 2005) (citing *Walker*, 889 F.2d at 50).

Plaintiff asserts that the ALJ's hypothetical did not include all of his limitations and needed to be more "closely approximating" to an individual similar to himself.  (Docket no. 28 at 5).  Specifically, plaintiff claims the ALJ failed to account for his pain, dizziness and balance, and tingling and shaking in his legs, feet, and hands.  (*Id.*).

At the hearing on November 1, 2017, before the vocational expert testified, the ALJ questioned plaintiff about his limitations to include his pain, balance, and ability to carry and

hold items. (AR 544–47). Plaintiff's responses explained the numbness in his legs and the need

to sit and stand intermittently; his ability to carry items, such as a milk container, if balanced by

holding items in both hands at the same time; his ability to use a knife and fork and hold a coffee

mug; and his ability to help with chores around the house and garden. (AR 544–47). Based on

these answers, many of which demonstrated plaintiff's capabilities, the ALJ's hypothetical

"fairly set out" plaintiff's limitations. *See Walker*, 889 F.2d at 47.

Tonja Hubacker, a vocational expert, then testified, identifying three occupations

available in the national economy that plaintiff could perform. (AR 29, 556–57). Her testimony

was based on the ALJ's hypothetical of an individual of plaintiff's age, education, work

experience, and residual functional capacity to perform light work with the additional limitations

of occasionally lifting and carrying twenty pounds, but more frequently ten pounds; sitting,

standing, and walking for up to six hours; pushing and pulling as much as the individual can lift;

occasionally climbing ramps and stairs, but never ladders, ropes, or scaffolds; occasionally

balancing, stooping, kneeling, crouching, and crawling but never working at unprotected heights,

with moving mechanical parts, dangerous parts, or other similar workplace hazards; having

occasional exposure to dust, odors, fumes and pulmonary irritants but never to extreme cold or

heat; and never working on an assembly line given left peripheral vision issues. (AR 555–56).

The three job categories were that of a router (unskilled with an SVP code 2); a non-postal mail

clerk (unskilled with an SVP code 2); and a stock checker (unskilled with an SVP code 2). (AR

29). The vocational expert testified that each of the positions existed in significant numbers in

the national economy. (*Id.*). The ALJ found the expert's testimony consistent with the

information contained in the Dictionary of Occupational Titles ("DOT"). (*Id.*). The ALJ also

found the vocational expert's testimony concerning the use of telephones, not specifically

21

addressed in the DOT, was based on her experience and knowledge as an expert. (*Id.*). On these

bases, the ALJ determined that plaintiff could make a successful adjustment to such work. (*Id.*).

The vocational expert's testimony, based on a hypothetical which fairly incorporated

plaintiff's limitations, provides substantial evidence to support the ALJ's determination that

plaintiff is no longer disabled and can perform work that exists in the national economy.

### C.   The ALJ provided an adequate explanation for according less than controlling weight to Dr. Wilbank's and Dr. Purow's opinions and fully and fairly developed the record

Plaintiff's second challenge asserts that the ALJ erred in giving "little weight" to Dr.

Wilbank's and Dr. Purow's opinions. (Docket no. 23 at 9–11). Additionally, plaintiff contends

that the ALJ failed to properly develop the record. (*Id.* at 11–12).

In determining whether a claimant has a medically-determinable severe impairment, or

combination of impairments, which would significantly limit the claimant's physical or mental

ability to do basic work activities, the ALJ is required to analyze the claimant's medical records

alongside consultative or medical expert evaluations. 20 C.F.R. §§ 404.1512, 404.1527,

416.912, 416.927. The ALJ must consider all medical opinions. 20 C.F.R. §§ 404.1527(b),

416.927(b). When the medical opinions prove inconsistent with other evidence in the record, or

are themselves internally inconsistent, the ALJ evaluates the opinions and assigns them weights

as part of the analysis. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c); *see also Tanner v. Comm'r of

Soc. Sec.*, 602 Fed. App'x 95, 100 (4th Cir. 2015) ("An ALJ is required to assign weight to every

medical opinion in a claimant's record."). If the ALJ fails to "sufficiently explain the weight

[s]he has given to obviously probative exhibits, to say that h[er] decision is supported by

substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a

whole to determine whether the conclusions reached are rational.'" *Arnold v. Sec'y of Health,*

*Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)). A reviewing court "cannot determine if findings are unsupported by substantial evidence unless the [ALJ] explicitly indicates the weight given to all the relevant evidence." *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (citations omitted).

The regulations indicate that a medical opinion is a "statement from [an] acceptable medical source that reflects [a] judgment[] about the nature and severity of [the claimant's] impairments, including . . . symptoms, diagnosis, and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a), 416.927(a)(1).

    *1.    Dr. Wilbank's Opinion*

Plaintiff argues that the ALJ erred when she assigned "little weight" to Dr. Wilbank's opinion. (*Id.* at 9–10). He argues that the ALJ's "pick and choose" approach resulted in her utilizing only the evidence that supported her conclusion and ignoring other evidence that demonstrated plaintiff was still disabled. (*Id.*). In response, the Commissioner contends that the ALJ's decision was supported by substantial evidence in the record. (Docket no. 25 at 19). Specifically, the Commissioner argues that Dr. Wilbank's opinion was inconsistent with plaintiff's own testimony in November 2017 and failed to offer insight into plaintiff's work-related functional restrictions. (*Id.* at 18–19).

In a brief, undated "to whom it may concern" note, Dr. Wilbank states that plaintiff was seen in the University of Virginia Ophthalmology Clinic three times over a two-month period in July and August 2017. (AR 473). Dr. Wilbank states that the Ophthalmology Clinic plans to follow plaintiff closely given his "condition" that "severely limited his vision in his left eye." (*Id.*). Dr. Wilbank indicates that it was unlikely plaintiff would regain much vision in that eye,

23

but plaintiff sees 20/30 in his right eye. (*Id.*). This note does not include any physical restrictions as a result of the condition or detail any work-related accommodations that would address the vision issues in plaintiff's left eye. Nonetheless, the ALJ still considered Dr. Wilbank's treatment record as a medical opinion and, accordingly, assigned it a weight. (AR 27).

A review of the ALJ's decision shows the basis for her evaluation of Dr. Wilbank's opinion as inconsistent with plaintiff's testimony, and the reasons for assigning it "little weight." (*Id.*). First, the ALJ discussed the conflict between Dr. Wilbank's medical opinion and the plaintiff's statements at the hearing. (*Id.*). While Dr. Wilbank opined that plaintiff was unlikely to regain much vision in his left eye, plaintiff reported that he was able to read with his glasses on and watch television too. (AR 552–53). Second, the ALJ found Dr. Wilbank's opinion inconsistent with the examination notes from a follow-up ophthalmology appointment with Dr. Conway on September 28, 2017, in which it is noted that plaintiff's vision in his right eye is 20/20, that the vision in his left eye ("OS vision") is a little better, and that he denies vision loss. (AR 26–27, 522–23). Following a successful Avastin injection at that visit, Dr. Conway noted that plaintiff could count fingers from at least two feet away. (AR 26–27, 525). A review of the ALJ's decision shows that she considered the evidence in the record and sufficiently explained her rationale as to the weight given to Dr. Wilbank's medical opinion. Her decision was supported by substantial evidence in the record. Despite the above-mentioned inconsistences, however, the ALJ– "out of an abundance of caution"–still included limitations on workplace hazards and dangerous machinery in her residual functional capacity assessment to account for plaintiff's limited vision in his left eye. (AR 26).

Based on the foregoing, the undersigned recommends a finding that the ALJ provided an adequate explanation for affording Dr. Wilbank's opinion "little weight," and that her decision is supported by substantial evidence.

### 2.    Dr. Purow's Opinion

Plaintiff also asserts that the ALJ erred in finding that Dr. Purow failed to provide a function-by-function assessment of plaintiff's abilities and limitations. (Docket no. 23 at 10). He contends that this assessment was incorporated in Dr. Purow's progress notes from several years of medical appointments with plaintiff. (*Id.* at 10). In addition, plaintiff alleges that the ALJ erred in her decision to afford "little weight" to Dr. Purow's opinion, as his treating physician, because no persuasive contradictory evidence existed that allowed the ALJ to disregard the opinion. (*Id.* at 10–11). Rather, plaintiff states the ALJ should have found Dr. Purow's opinion persuasive because of his special treatment relationship with plaintiff. (Docket no. 28 at 4). The Commissioner responds that Dr. Purow failed to opine about plaintiff's functional abilities and limitations thus his opinion was of "little value." (Docket no. 25 at 20). Additionally, the Commissioner argues that Dr. Purow's opinion contained "material inconsistencies" with his treatment notes, providing a "compelling" basis for the ALJ to give little weight to the opinion overall. (*Id.*).

Under the applicable regulations, a "treating source" is defined as an acceptable medical source who provides, or has provided, "medical treatment or evaluation and who has, or has had, an ongoing treatment relationship" with the claimant. 20 C.F.R. §§ 404.1502, 416.927(a)(2). Licensed physicians, licensed or certified psychologists, and certain other specialists are considered acceptable medical sources. 20 C.F.R. §§ 404.1502, §416.927. Generally, a treating source's medical opinions are afforded greater weight because they are more likely to provide a

"detailed, longitudinal picture" of a claimant's impairments. 20 C.F.R. § 404.1527(c)(2), 416.927(c)(2). The treating source may bring a "unique perspective" to the evidence that would not otherwise be available from the objective medical findings or the reports of individual examinations alone. 20 C.F.R. § 404.1527(c)(2), 416.927(c)(2). The Commissioner gives a treating source controlling weight when the opinion, regarding the nature and severity of the claimant's impairments, is well-supported by "medically acceptable clinical and laboratory diagnostic techniques" and is consistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2), 416.927(c)(2). However, an ALJ is not required to give a treating source's opinion controlling weight when there is "persuasive contrary evidence." *Craig*, 76 F.3d at 590 ("By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight."). Furthermore, the ALJ does not need to afford greater weight to a treating source simply because the physician is only one of a few individuals to treat the claimant. *See, e.g., Caudle v. Colvin*, No. 3:13-cv-091-JAG, 2013 WL 5874622, at *10–14 (E.D. Va. Oct. 30, 2013).

The ALJ must consider certain enumerated factors when assigning a treating source's medical opinion less than controlling weight and must provide good reasons for the final weight given. 20 C.F.R. §§ 404.1527(c), 416.927(c). The regulations provide that the ALJ consider (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the source's opinion based on the medical record; (4) the consistency between the opinion and the medical record; (5) the treating source's specialization, if any; and (6) other relevant factors that the claimant brings to the ALJ's attention or that which the ALJ is aware supports or contradicts the opinion. 20 C.F.R. §§ 404.1527(c), 416.927(c). Generally, a court will not disturb an ALJ's assignment of a particular

26

weight to a medical opinion unless the ALJ fails to sufficiently explain her decision or there is some indication she has "dredged up 'specious inconsistencies.'" *Dunn v. Colvin*, 607 F. App'x 264, 267 (4th Cir. 2015) (citing *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992)).

In developing plaintiff's residual functional capacity, the ALJ reviewed Dr. Purow's medical opinion and his examination notes. (AR 25–26). The ALJ concluded that Dr. Purow's opinion was entitled to little weight for three reasons: first, he had failed to provide a function-by-function assessment; second, his examination notes contradicted his opinion; and third, his opinion proved inconsistent with other examination findings in the record. (AR 25–27). The ALJ's explanation for assigning little weight to Dr. Purow's opinion certainly allows for meaningful review by the district court and it is supported by substantial evidence in the record.

As the ALJ noted, Dr. Purow did not complete a function-by-function assessment of plaintiff's abilities and limitations. In plaintiff's "Peripheral Neuropathy Medical Source Statement," "Physical Medical Source Statement," and "Dizziness Medical Source Statement," Dr. Purow either scored through or left blank the sections which asked him to delineate plaintiff's limitations and abilities in a working environment. (AR 510–12, 515–17, 519–20). Instead, Dr. Purow wrote a short annotation on the scored or blanked out pages providing that plaintiff suffers from "increased dizziness" when using stairs or from prolonged standing and that he is unable to sit in a chair for long periods of time because of pain flare-ups. (AR 510, 515, 520). Dr. Purow also added the notation "see attached notes" to these annotations, presumably a reference to the progress notes from each of plaintiff's visits. (AR 510, 511, 515, 516, 520). Despite these brief annotations, Dr. Purow does not explicitly provide an opinion as to plaintiff's specific functional capabilities. For example, Dr. Purow fails to opine how much weight plaintiff can lift and carry or how much time plaintiff can use his hands, fingers, and arms

27

in a given eight-hour work day for activities such as grasping, turning, and reaching.  This evidence provides a "good reason" behind the ALJ's assignment of "little weight" to Dr. Purow's opinion, especially in light of the two, complete residual functional capacity assessments by Drs. Staehr and Kadian.  (AR 305–312, 415–422).

Plaintiff's contention that no persuasive contradictory evidence existed that would allow the ALJ to disregard Dr. Purow's medical opinion incorrectly posits that the ALJ afforded no weight at all to the opinion.  The ALJ did not disregard Dr. Purow's opinion entirely.  Rather, she assigned the opinion "little weight."  As noted above, in addition to Dr. Purow's failure to provide a function-by-function assessment of plaintiff's abilities, the ALJ also found that Dr. Purow's opinion contradicted his own examination notes and was inconsistent with other examination findings in the record.  (AR 26–27).  The ALJ noted Dr. Purow's opinion found plaintiff unable to work for the next twelve months.  (AR 26).  Additionally, Dr. Purow opined that plaintiff could not operate a motor vehicle nor could he "sit still in a chair for long periods due to flares in pain." (*Id.*).  Turning to the record, the ALJ found evidence indicating that although plaintiff had developed neuropathy from his prior chemotherapy, his symptoms were alleviated when he took Lyrica. (*Id.*).  Moreover, although plaintiff had "numbness and tingling in his feet, dizziness, and shooting pain in his feet, lower legs, hands and forearms," he testified that he could "help with household chores, cook, shop for groceries with his wife, take public transportation, dress independently, and tie his shoes." (*Id.*).  The ALJ also noted that although plaintiff had some unsteadiness in heel walking, he had "normal musculoskeletal and cranial nerve examinations, including intact sensation, 5/5 strength in all extremities, no Romberg sign, and [the] ability to toe and tandem walk." (AR 26–27).  Drawing a direct contradiction, the ALJ highlighted how Dr. Purow's own examination notes indicated that plaintiff's prolactinoma was

28

stable. (AR 27). Further, Dr. Purow's opinion proved inconsistent with that of Dr. Kadian and Dr. Staehr's opinions, who both found plaintiff could perform a limited range of light work. (*Id.*). The ALJ provided sufficient explanation behind her decision to give "little weight" to Dr. Purow's medical opinion, given its inconsistency with other evidence presented in the record and the internal contradictions present with Dr. Purow's own examination notes.

As set forth above, the ALJ supported her assignment of "little weight" to Dr. Purow's medical opinion by citing to the inconsistency of the opinion with the record. A further rationale for the ALJ's decision focused on Dr. Purow's failure to provide a function-by-function assessment of plaintiff's abilities or limitations. The ALJ sufficiently articulated the substantial "persuasive contrary evidence" in the record to demonstrate why she did not assign controlling weight to Dr. Purow's opinion. Plaintiff's assertion is, therefore, unavailing.

### 3.   *The Record is Adequate*

Plaintiff's final argument contends that the ALJ failed to fulfill her obligation to develop the record. (Docket no. 23 at 11). The ALJ, plaintiff asserts, did not contact the treating physician to determine whether additional information that she required was readily available, especially when the evidence presented by the treating physician was considered inadequate. (*Id.*). Instead, plaintiff claims the ALJ substituted her opinion for those of the medical experts resulting in a decision not supported by substantial evidence. (*Id.* at 11–12). Plaintiff alleges, therefore, that the ALJ's determination of his disability was based on an incomplete record. (*Id.* at 12). In response, the Commissioner asserts that the ALJ was under no such obligation to develop the record here, given that there was sufficient evidence for the ALJ to make a determination concerning plaintiff's disability. (Docket no. 25 at 17).

The ALJ has an obligation to "explore all relevant facts and inquire into the issues necessary for the adequate development of the record, and cannot rely only on the evidence submitted by the claimant when that evidence is inadequate." *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986). If the claimant's medical records are "inadequate" and the ALJ is unable to make a disability determination, then the ALJ must seek additional records for clarification, including contacting the claimant's treating physician. 20 C.F.R. §§ 404.1512(e)(1), 416.912(b). The ALJ must develop a claimant's "complete medical history." 20 C.F.R. §§ 404.1512(d), 416.912(b). However, the ALJ's duty does not require her to act as the claimant's substitute counsel. *Lehman v. Astrue*, 931 F. Supp. 2d 682, 693 (D. Md. 2013); *Stuckey v. Colvin*, No. 2:14cv656, 2016 WL 403651, at *11 (E.D. Va. Jan. 11, 2016) (internal citations omitted). Rather, she can assume that a claimant who is represented by counsel "is making his strongest case for benefits." *Aytch v. Astrue*, 686 F. Supp. 2d 590, 599 (E.D.N.C. 2010). Ultimately, to determine "whether an ALJ has fully and fairly developed the record, the proper inquiry is whether the record contains sufficient evidence" to make a disability determination. *Loving v. Astrue*, No. 3:11cv411-HEH, 2012 WL 4329283, at *5 (E.D. Va. Sept. 20, 2012). Where the ALJ fails to inquire fully into those issues required to develop the record and the claimant is prejudiced by this failure, remand is necessary. *Marsh v. Harris*, 632 F.2d 296, 300 (4th Cir. 1980). A claimant can establish prejudice by showing that the ALJ's decision "might reasonably have been different had [that] evidence been before [her]." *Sims v. Harris*, 631 F.2d 26, 28 (4th Cir. 1990) (quoting *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)).

First, the ALJ was not under a duty to recontact plaintiff's treating physician, Dr. Purow. Plaintiff visited Dr. Purow for treatment pertaining to his prolactinoma and, in due course, for neuropathy resulting from plaintiff's prior chemotherapy. (AR 480–513). In reviewing Dr.

Purow's medical opinion, the ALJ noted the conflict between his opinion and his examination notes, as well as the inconsistency with other examination findings in the record.  (AR 26–27).  There is no indication that the record did not contain all of Dr. Purow's notes and records pertaining to his treatment of the plaintiff.  It is also clear that Dr. Purow was provided with several forms in which certain information was requested concerning the plaintiff, but he failed to provide specific information concerning plaintiff's functional limitations in a competitive work situation.  (AR 509–21).  However, that lack of information from Dr. Purow did not preclude the ALJ from reaching a determination regarding plaintiff's disability.  The ALJ's decision drew on a range of medical records, including the contemporaneous notes from Dr. Purow and opinions from other physicians, to support her conclusion that plaintiff was no longer disabled as of December 14, 2014.  (AR 24–27).  As such, plaintiff's medical records were not "inadequate" and the ALJ did not need to seek additional records for further clarification.

Second, the ALJ's decision is supported by a complete record that contains sufficient evidence to determine plaintiff's disability.  It is unclear what evidence plaintiff feels was missing in order to render the record incomplete and hindered the ALJ's ability to reach a conclusion.  The hearing transcript indicates that the ALJ elicited information from plaintiff about his age, education, previous employment, impairments, medical treatment, and daily activities.  (AR 539–54).  Further, both the ALJ and plaintiff's attorney posited hypothetical questions to the vocational expert based on plaintiff's testimony and the record.  (AR 554–61).  Plaintiff's attorney had a full opportunity to elicit further testimony about plaintiff's impairments, medical treatment, and work experience, and he was given additional time by the Appeals Council to provide more information if he deemed it necessary.  (AR 12–13).  Additionally, as noted above, the ALJ was not required to contact Dr. Purow to request

additional medical records since the record already contained all of his treatment notes.  In determining plaintiff's capabilities, the ALJ referred to the array of medical reports and examination notes to reach her overall decision.  (AR 25–27).  She incorporated plaintiff's medical history alongside more current records.  (*Id.*).  The factual record in this case is sufficient to determine plaintiff's disability and provides adequate support for the ALJ's decision.

Based on the foregoing, the undersigned recommends a finding that the ALJ properly and sufficiently developed the record.

## V.  CONCLUSION

Based on the foregoing, it is recommended that the court finds that the Commissioner's final decision denying plaintiff SSI and DBI benefits for the period December 18, 2014 through the date of the decision is supported by substantial evidence, and that the proper legal standards were applied in evaluating the evidence.  Accordingly, the undersigned recommends that the plaintiff's motion for summary judgment (Docket no. 22) be denied, the Commissioner's motion for summary judgment (Docket no. 24) be granted, and the final decision of the Commissioner be affirmed.

## NOTICE

Failure to file written objections to this report and recommendation within 14 days after being served with a copy of this report and recommendation may result in the waiver of any right to a *de novo* review of this report and recommendation and such failure shall bar you from attacking on appeal any finding or conclusion accepted and adopted by the District Judge except upon grounds of plain error.

Entered this ⬛ day of October, 2019.

                                    /s/
                          John F. Anderson
                          United States Magistrate Judge
                          John F. Anderson
                          United States Magistrate Judge

Alexandria, Virginia